ACCEPTED
03-15-00079-CR
6836382
THIRD COURT OF APPEALS
AUSTIN, TEXAS
9/8/2015 11:32:44 PM
JEFFREY D. KYLE
CLERK

No. 03-15-00079-CR

_____

**IN THE COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS**

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
9/8/2015 11:32:44 PM
JEFFREY D. KYLE
Clerk

_____

DAVID KENT THACKER, Appellant

v.

THE STATE OF TEXAS, Appellee

_____

On Appeal from the 207th Judicial District Court of Comal County, Texas
Cause No. CR2013-096
Honorable Jack Robison, District Judge Presiding

_____

**BRIEF FOR THE STATE**

_____

**Jennifer Tharp**
**Criminal District Attorney**

**By**
**Joshua D. Presley**
**SBN: 24088254**
**Assistant District Attorney**
**150 N. Seguin Avenue, Suite #307**
**(830) 221-1300**
**Fax (830) 608-2008**
**New Braunfels, Texas 78130**
**E-mail: preslj@co.comal.tx.us**
**Attorney for the State**

**Oral Argument Is Requested**

i

<u>Identity of Parties and Counsel</u>

**Attorneys for the Appellant David Kent Thacker**

**AT TRIAL & ON APPEAL**
Gerald C. Moton
Moton Law Office
PMB 248
San Antonio, TX 78216
Tel: (830) 221-1300
Fax: (830) 620-5599
Email: motongerald32@gmail.com

**Attorneys for the Appellee, The State of Texas**

**AT TRIAL**
Daniel Palmitier
Assistant District Attorney
COMAL COUNTY CRIMINAL DISTRICT ATTORNEY'S OFFICE
150 N. Seguin Avenue, Suite 307
New Braunfels, Texas 78130
Telephone: (830) 221-1300
Facsimile: (830) 608-2008
Email: palmid@co.comal.tx.us

**ON APPEAL**
Joshua D. Presley - SBN# 24088254
Assistant District Attorney
COMAL COUNTY CRIMINAL DISTRICT ATTORNEY'S OFFICE
150 N. Seguin Avenue, Suite 307
New Braunfels, Texas 78130
Telephone: (830) 221-1300
Facsimile: (830) 608-2008
Email: preslj@co.comal.tx.us

# Table of Contents

Index of Authorities ............................................................................................... v

Statement of the Case ............................................................................................ 1

Statement of Facts ................................................................................................. 2

**Facts Learned During Tucker's Initial Encounter with Appellant Gave Rise to Reasonable Suspicion for an Investigatory Stop** ................................................ 7

    *Summary of the Argument* ................................................................................ 7

    A. Officer Tucker observed that Appellant's vehicle was in violation of § 545.302 of the Transportation Code .......................................................... 9

    B. Officer Tucker could have investigated Appellant's car parked on the railroad tracks pursuant to the community caretaking function .................. 10

    C. Facts learned from Tucker's and Flugrath's observations of Appellant led to reasonable suspicion justifying an investigative detention ..................... 15

**Miranda Warnings Are Not Required at the Outset of an Investigatory Detention** .......................................................................................................... 19

    *Summary of the Argument* .............................................................................. 19

    Argument ........................................................................................................... 20

**The Evidence Was Legally Sufficient to Convict Appellant of Operating a Motor Vehicle in a Public Place** ...................................................................... 25

    *Summary of the Argument* .............................................................................. 25

    Argument ........................................................................................................... 28

**Appellant's Sentence Did Not Violate the Constitutional Prohibition on Cruel and Unusual Punishment** ................................................................................... 37

    *Summary of the Argument* .............................................................................. 37

Argument.........................................................................................38

Summary of Historical Developments in Eighth Amendment Caselaw ......40

Prayer.............................................................................................58

Certificate of Service ......................................................................59

Certificate of Compliance................................................................59

Appendix........................................................................................60

# Index of Authorities

## Statutes, Rules & Secondary Sources

Tex. Pen. Code Ann. § 1.07(a)(40)
(West, Westlaw through 2015 R.S.)................................................................34

Tex. Transp. Code Ann. § 545.302 (West, Westlaw through 2015 R.S.)....... *passim*

Tex. R. App. P. 33.1(a) ................................................................................10

Tex. R. App. P. 38.1(h) ...............................................................................10

Tex. R. Evid. 103(a)(1) ...............................................................................21

## Cases

*Abernathy v. State*, 963 S.W.2d 822 (Tex.
App.—San Antonio 1998, pet. ref'd) ...........................................................22

*Balentine v. State*, 71 S.W.3d 763 (Tex.
Crim. App. 2002)..........................................................................................8

*Belcher v. State*, 244 S.W.3d 531 (Tex.
App.—Fort Worth 2007, no pet.).................................................................18

*Brown v. State*, 649 S.W.2d 160 (Tex.
App.—Austin 1983, no pet.).......................................................................28

*Cortez v. State*, 08-02-00363-CR, 2004
WL 178587 (Tex. App.—El Paso Jan. 29,
2004, pet. ref'd).........................................................................................27

*Davidson v. State*, 03-13-00708-CR, 2014
WL 3809813 (Tex. App.—Austin Aug. 1,
2014, no pet.) (not designated for
publication) .....................................................................................39, 40, 57

*Ewing v. California*, 538 U.S. 11 (2003) ...........................................................51

*Fowler v. State*, 65 S.W.3d 116 (Tex. App.—Amarillo 2001, no pet.) ...........................................................36

*Garcia v. State*, 43 S.W.3d 527 (Tex. Crim. App. 2001) ........................................................... 8, 14

*Garza Gonzalez v. State*, 783 S.W.2d 774 (Tex. App.—Corpus Christi 1990, no pet.)...........................................................21, 22

*Gonzales v. State*, 369 S.W.3d 851 (Tex. Crim. App. 2012) ...........................................................*passim*

*Graham v. West Virginia*, 224 U.S. 616 (1912) ...........................................................40, 41

*Hall v. State*, AP-75,121, 2007 WL 1847314 (Tex. Crim. App. June 27, 2007) ........................................................... 16, 18

*Harmelin v. Michigan*, 501 U.S. 957 (U.S. 1991)...........................................................50

*Hearne v. State*, 80 S.W.3d 677 (Tex. App.—Houston [1st Dist.] 2002, no pet.)...........................................................31

*Hernandez v. State*, 599 S.W.2d 614 (Tex. Crim. App. 1980) (op. on reh'g) ...........................................................21

*Hernandez v. State*, 107 S.W.3d 41 (Tex. App.—San Antonio 2003, pet. ref'd) ...........................................................22

*Herrera v. State*, 241 S.W.3d 520 (Tex. Crim. App. 2007)...........................................................22

*Holloman v. State*, 11-95-275-CR, 1995 WL 17212433 (Tex. App.—Eastland Dec. 21, 1995, pet. ref'd) (not designated for publication) ............................................................35

*Hutto v. Davis*, 454 U.S. 370 (U.S. 1982).............................................. 43-45, 49-50

*Jackson v. Virginia*, 443 U.S. 307 (1979) ...................................................... 26, 28

*Jacobs v. State*, 80 S.W.3d 631 (Tex.App. —Tyler 2002; *no pet.*) .........................................................................55

*Jordan v. State*, 2-05-364-CR, 2006 WL 2310531 (Tex. App.—Fort Worth Aug. 10, 2006, no pet.) ...........................................................24

*Kiffe v. State*, 361 S.W.3d 104 (Tex. App. —Houston [1st Dist.] 2011, pet. ref'd) ....................................................... 26, 27

*Kirsch v. State*, 357 S.W.3d 645 (Tex. Crim. App. 2012) ...........................................................29

*Kuciemba v. State*, 310 S.W.3d 460 (Tex. Crim. App. 2010) ...........................................................33

*Margraves v. State*, 34 S.W.3d 912 (Tex. Crim. App. 2000) ...........................................................28

*McGruder v. Puckett*, 954 F.2d 313 (5th Cir. 1992) ...........................................................52-54

*Mitten v. State*, 228 S.W.3d 693 (Tex. App.—Corpus Christi 2005, pet. ref'd, untimely filed) ...........................................................23

*Priego v. State*, 457 S.W.3d 565 (Tex. App.—Texarkana 2015), *petition for discretionary review refused* (June 3, 2015)...........................................................29-32

*Pryor v. State*, 03-13-00347-CR, 2015
WL 2066228 (Tex. App.—Austin May 1,
2015) (not designated for publication),
*petition for discretionary review filed*
(Aug. 6, 2015) ...................................................................................39

*Rachal v. State*, 917 S.W.2d 799 (Tex.
Crim. App. 1996) ................................................................................17

*Roberson v. State*, 16 S.W.3d 156 (Tex.
App.—Austin 2000, pet. ref'd) .....................................................27, 28

*Rockwell v. State*, AP-76,737, 2013 WL
6529575 (Tex. Crim. App. Dec. 11, 2013)
(not designated for publication) ...........................................................27

*Rubeck v. State*, 61 S.W.3d 741 (Tex.
App.—Fort Worth 2001, no pet.)............................................................9

*Rummel v. Estelle*, 445 U.S. 263 (U.S.
1980).............................................................................................*passim*

*Russeau v. State*, 291 S.W.3d 426 (Tex.
Crim. App. 2009)................................................................................10

*Shaub v. State*, 99 S.W.3d 253 (Tex. App.
—Fort Worth 2003, no pet.) ...........................................................34, 35

*Simmons v. State*, 14-07-00301-CR, 2008
WL 2580380 (Tex. App.—Houston [14th
Dist.] July 1, 2008, no pet.) ................................................................10

*Smith v. State,* 683 S.W.2d 393, 410 (Tex.
Crim. App. 1984)................................................................................10

*Solem v. Helm*, 463 U.S. 277 (U.S. 1983).....................................46-49

*State v. Duran*, 396 S.W.3d 563 (Tex.
Crim. App. 2013)............................................................................16, 18

*State v. Gray*, 158 S.W.3d 465 (Tex. Crim. App. 2005) ..................................................................8

*State v. Villarreal*, PD-0306-14, 2014 WL 6734178 (Tex. Crim. App. Nov. 26, 2014), *reh'g granted* (Feb. 25, 2015) ...............................................24

*State v. Waldrop*, 7 S.W.3d 836 (Tex. App. —Austin 1999, no pet.) .......................................................21

*Tanner v. State*, 228 S.W.3d 852 (Tex. App.—Austin 2007, no pet.) ........................................*passim*

*Terry v. Ohio*, 392 U.S. 1 (1968) .....................................................15

*Trevino v. State*, 07-04-0066-CR, 2005 WL 1404037 (Tex. App.—Amarillo June 15, 2005, pet. ref'd) (not designated for publication) .....................................................................56

*Tufele v. State*, 130 S.W.3d 267 (Tex. App. —Houston [14th Dist.] 2004, no pet.) ...............................10

*U.S. v. Arvizu*, 534 U.S. 266, 273 (2002) ............................................15

*Wiede v. State*, 214 S.W.3d 17 (Tex. Crim. App. 2007) ..................................................................8

*Wiegand v. State*, 03-98-00303-CR, 1999 WL 546844, at *1 (Tex. App.—Austin July 29, 1999, pet. ref'd) (not designated for publication) ........................................ 9, 18

*Winfrey v. State*, 393 S.W.3d 763 (Tex. Crim. App. 2013), *reh'g denied* (Apr. 17, 2013)....................................................................26

## Statement of the Case

Appellant was charged by indictment with Driving While Intoxicated with Two or More Previous Convictions for the Same Type of Offense (I C.R. at 6). The charge was enhanced from a third degree felony to habitual offender status (*id.*). Although the trial court initially denied Appellant's motion to suppress the results of his warrantless blood draw, it later reconsidered and granted the motion to suppress, apparently based solely on the holding in "The State of Texas v. David Villareal, P.D. 0306-14" (*id.* at 146).

Appellant plead not guilty and was subsequently convicted by a jury (I Supp. C.R. at 4). After hearing evidence and argument, punishment was also assessed by the jury at life imprisonment on January 28, 2015 (*id.*). Appellant timely filed his notice of appeal.

1

## Statement of Facts

On the night of Saturday, September 14, 2012, Officer Jason Tucker responded to a report of a vehicle on the railroad tracks (II R.R. at 9; IV R.R. at 55).[1] At the railroad's dark and sparsely-populated intersection with FM 306, Tucker observed a maroon Cadillac parked about 20 feet off the roadway and right next to the tracks (II R.R. at 10; Defense Ex. 1 at 11:29:50 p.m.; State's Ex. 2 11:29:50)).[2] Tucker realized that any passing train would have struck the Cadillac (II R.R. at 10; IV R.R. at 57). Before he exited his patrol car, Tucker had police dispatch contact the Union Pacific railroad company to have them stop all trains on the track (VI R.R. at 6; IV R.R. at 59).

As Tucker approached the vehicle, he saw that the vehicle was still running (VI R.R. at 6; IV R.R. at 64). He shined his flashlight into the car and observed Appellant, David Thacker, sitting in the driver's seat (VI R.R. at 6; IV R.R. at 57). Appellant was slumped over the center console and was sound asleep (VI R.R. at 6; IV R.R. at 57). Tucker made his way to the driver's side of the car and attempted to wake Appellant up (VI R.R. at 6; IV R.R. at 57). Tucker was

---

[1] For quick reference, the Statement of Facts includes parallel citations to the suppression hearing first (II R.R., VI R.R. at 6-7, or Defense Ex. 1) followed by a citation to the trial itself (IV R.R. or State's Ex. 2) where the information appears in both records.
[2] All times listed in this brief refer to the integrated timestamps in the videos depicting the actual hour, minute and second. Furthermore, the timestamp references to Defense Ex. 1 (entered into evidence at the motion to suppress), and State's Ex. 2 (entered into evidence at trial), will be the same.

eventually able to wake the Appellant by shaking and yelling at him (VI R.R. at 6; IV R.R. at 57). Appellant was disoriented and incoherent, and Tucker noticed a strong odor of alcohol coming from the vehicle (II R.R. at 12; IV R.R. at 57-59, 62). When Tucker told Appellant to hop out of the car, Appellant said he would drive (Defense Ex. 1 at 11:32:10; State's Ex. 2 at 11:32:10).

Tucker told Appellant to put his flip-flop on so he could get out of the car, and Appellant struggled to get it on his foot (*id.*; IV R.R. at 58). When Appellant finally exited the vehicle, he had to use the Cadillac's door as a crutch, and appeared to be "pretty unsteady on his feet" (II R.R. at 12; *see also* IV R.R. at 58). Because Tucker was worried about their dangerous location, he immediately escorted Appellant to his patrol car, holding Appellant's arm to help him maintain his balance (II R.R. at 12-13; VI R.R. at 6; IV R.R. at 58). Appellant stood by Tucker's patrol vehicle – leaning on the grill guard for support – while Tucker returned to the Cadillac (II R.R. at 13; IV R.R. at 58-59). Tucker moved the Cadillac a safe distance away from the tracks, had dispatch call Union Pacific to inform them the line was now clear, and returned to the Appellant (VI R.R. at 6-7; IV R.R. at 58-60 (omitting reference to the subsequent call to Union Pacific)).

Appellant said he lived in Canyon Lake, Texas (Defense Ex. 1 at 11:37:40; State's Ex. 2 at 11:37:40). Tucker could smell a strong odor of alcohol coming from Appellant (VI R.R. at 7; IV R.R. at 59 (metabolized alcohol)). Tucker also

3

noticed that Appellant's speech was slurred, and his eyes were bloodshot and glassy (II R.R. at 14; IV R.R. at 62). Appellant said he had been with some friends, and he was going to another friend's house in Boerne (Defense Ex. 1 at 11:37:50, 11:39:10; State's Ex. 2 at 11:37:50, 11:39:10). When Tucker asked Appellant where he was, he believed he was in Boerne (Defense Ex. 1 at 11:38:10; State's Ex. 2 at 11:38:10). Appellant said he "may have made a mistake" (Defense Ex. 1 at 11:38:28; State's Ex. 2 at 11:38:28). When Tucker asked "[h]ow much have you had to drink, partner?" Appellant responded "[t]oo much" (Defense Ex. 1 at 11:40:24; State's Ex. 2 at 11:40:24). Tucker pointed out that if a train had come by Appellant probably would have been killed, and Appellant said he "didn't want that" (Defense Ex. 1 at 11:40:30; State's Ex. 2 at 11:40:30).

Appellant told Tucker that his mother could come pick him up, adding that he knew he "messed up" (Defense Ex. 1 at 11:43:52; State's Ex. 2 at 11:43:52). Tucker explained that there would be an investigation, stating that "we're far from making a decision – [on] what we're gonna do tonight" (Defense Ex. 1 at 11:43:52; State's Ex. 2 at 11:43:52). Appellant again stated "I know I messed up. I apologize" (Defense Ex. 1 at 11:44:13; State's Ex. 2 at 11:44:13). Tucker told Appellant that Officer Flugrath would ask him some questions to figure out what was going on (Defense Ex. 1 at 11:44:13; State's Ex. 2 at 11:44:13).

Officer Flugrath arrived soon after Tucker (Defense Ex. 1 at 11:41:15; State's Ex. 2 at 11:41:15). Flugrath had extensive experience with Driving While Intoxicated investigations (II R.R. at 39; VI R.R. at 9; IV R.R. at 85-86). When he walked up to Tucker and Appellant, Flugrath observed that Appellant appeared to be very disoriented (II R.R. at 35; IV R.R. at 88). After speaking with Tucker, Flugrath asked Appellant to come over to his vehicle so he could continue the interview (II R.R. at 35; IV R.R. at 90).

Flugrath likewise observed Appellant's glassy, bloodshot eyes and the strong odor of alcohol coming from Appellant (II R.R. at 36-37; IV R.R. at 90). Appellant said he had been visiting a friend in New Braunfels (VI R.R. at 10; State's Ex. 3-A at 11:47:03). Appellant said "I know I'm in trouble," and "I'm the worst" (State's Ex. 3-A at 11:47:48). Appellant thought it was 11:30 p.m., and told Flugrath he had left his friend's house around 10:30 p.m. (State's Ex. 3-A at 11:48:33; *see also* II R.R. at 37). Appellant told Flugrath that he had been alone in the car and that he remembered driving over the tracks, but did not remember parking next to them (II R.R. at 37; State's Ex. 3-A at 11:49:10; IV R.R. at 92). Appellant said "[a]pparently I made a mistake because if I was on a railroad track I apologize" (State's Ex. 3-A at 11:50:28; *see also* II R.R. at 39). When asked how much he drank at his friend's house, Appellant said "enough" (II R.R. at 37; State's Ex. 3-A at 11:50:55).

Flugrath performed the Horizontal Gaze Nystagmus test on Appellant, observing all six clues out of a possible six (II R.R. at 38; IV R.R. at 100). When the officer tried to have Appellant perform the walk-and-turn, Appellant said he could not do anything heel-to-toe (II R.R. at 39; IV R.R. at 102). When asked to perform the one-legged stand, Appellant refused, saying he was used to carrying 200-pound weights on his shoulders and could not balance without them (II R.R. at 39; State's Ex. 3-A at 11:58:50). Flugrath then asked Appellant to recite the alphabet; Appellant recited "A, B, C, D, E, F, G, H, I, J, K, L, M, N, O, P, M, M, L, M, N, O, P. Then he paused for a minute. Q, R, S, T, U, V, W, Y, X. Then he paused again, and then Y, Z" (II R.R. at 40; *see also* IV R.R. at 106). Appellant then said he could not perform the Romberg test because he was once in a rollover accident and could not tilt his head back (II R.R. at 40; State's Ex. 3-A at 12:00:50). Appellant then offered his hands behind his back so Flugrath could handcuff him (State's Ex. 3-A at 12:01:00).

Flugrath read Appellant his DIC-24 warning and Appellant refused to give a voluntary sample of his blood (II R.R. at 41-42; State's Ex. 3-A at 12:05:30, 12:09:55). After Appellant's arrest, Tucker performed an inventory search of the vehicle and located an open container of Calypso Spiced Rum – ¼ of it missing – in the passenger floorboard of the Cadillac (II R.R. at 15; IV R.R. at 63). Officer Tucker observed that "[a]s drunk as he is, he had to be drinking something else,

cause there wasn't enough missing out of that bottle to be that drunk" (Defense Ex. 1. at 12:12:24; State's Ex. 2 at 12:12:24). At trial, both Flugrath and Tucker testified that based on their training and experience, Appellant was too intoxicated to drive that night (IV R.R. at 77, 106-07; *see also* II R.R. at 40-41).

## Facts Learned During Tucker's Initial Encounter with Appellant Gave Rise to Reasonable Suspicion for an Investigatory Stop

### *Summary of the Argument*

Although Appellant complains that his arrest was made without a warrant, at the time of his arrest, officers had developed probable cause to believe he had been Driving While Intoxicated. Officer Tucker's initial encounter with Appellant was not a "stop" – though Tucker would have been justified in "stopping" Appellant for an apparent violation of the Transportation Code or pursuant to the community caretaking function. Facts learned during Tucker's encounter – communicated to Officer Flugrath – gave rise to reasonable suspicion to investigate Appellant for Driving While Intoxicated, and the subsequent investigative detention gave rise to probable cause for the arrest.

### *Motion to Suppress Standard of Review*

When reviewing a trial court's decision on a motion to suppress, appellate courts will give almost total deference to the trial court's determination of

historical facts, but review *de novo* its application of the law to the facts. *Tanner v. State*, 228 S.W.3d 852, 856 (Tex. App.—Austin 2007, no pet.) (citing *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002)). However, appellate courts should also give almost total deference to a trial court's application of the law to fact questions that turn on credibility and demeanor. *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001) (citing *Guzman v. State,* 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)).

Where trial courts do not make explicit findings of fact, the appellate court will review the evidence in a light most favorable to the trial court's ruling and assume it made implicit findings of fact supported by the record. *Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007); *Balentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002) (citing *Carmouche v. State*, 10 S.W.3d 323, 327-28 (Tex. Crim. App. 2000)) (internal citations omitted). "[C]ourts afford the prevailing party 'the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence." *Gonzales v. State*, 369 S.W.3d 851, 854 (Tex. Crim. App. 2012). Courts must sustain the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *State v. Gray,* 158 S.W.3d 465, 467 (Tex. Crim. App. 2005) (citing *State v. Ross*, 32 S.W.3d 853, 855-56 (Tex. Crim. App. 2000)).

**A.** **Officer Tucker observed that Appellant's vehicle was in violation of § 545.302 of the Transportation Code.**

Section 545.302 of the Transportation Code prohibits stopping, standing, or parking in certain areas. Tex. Transp. Code Ann. § 545.302 (West, Westlaw through 2015 R.S.). It states that "[a]n operator may not stop, stand, or park a vehicle: … on a railroad track …." *Id*. § 545.302(a)(8); *see also id*. § 545.302 (c)(1) (prohibiting parking "within 50 feet of the nearest rail of a railroad crossing").

At the suppression hearing, Tucker testified that while he did not know the specific provision, "the way [Appellant] was parked … is a violation of the Traffic Code of some sort" (II R.R. at 18; *id*. at 10 (Appellant was parked only 20 feet off the roadway and right next to the track)). Because Appellant was parked in violation of § 545.302, even if the encounter can be considered a "stop" (see *infra*), Tucker had at least reasonable suspicion that Appellant had committed a traffic offense. From his subsequent observation of Appellant, Tucker learned additional facts leading to reasonable suspicion to investigate for Driving While Intoxicated. *See Rubeck v. State*, 61 S.W.3d 741, 745 (Tex. App.—Fort Worth 2001, no pet.) ("Once a police officer makes a bona fide stop for a traffic offense, he may also investigate any other offense that he reasonably suspects has been committed."); *Wiegand v. State*, 03-98-00303-CR, 1999 WL 546844, at *1 (Tex. App.—Austin July 29, 1999, pet. ref'd) (not designated for publication) (where officer initially

9

stopped appellant for traffic violation, appellant's manner of speech and the odor of alcohol on his breath gave rise to reasonable suspicion to investigate for DWI). As discussed *infra*, Tucker communicated these facts to Flugrath, and Appellant's contention that Flugrath lacked reasonable suspicion for the investigative detention therefore lacks merit.

**B.**   **Officer Tucker could have investigated Appellant's car parked on the railroad tracks pursuant to the community caretaking function.**

Although Appellant recites some of the standard of review for community caretaking stops, he does not apparently challenge Tucker's ability to rely on the community caretaking function in the instant case. *See* Brief for Appellant at 12, 17-20. The lack of any specific argument or citations to the record regarding the caretaking function should preclude review of that issue. *See* Tex. R. App. P. 33.1(a), 38.1(h), (i); *Smith v. State,* 683 S.W.2d 393, 410 (Tex. Crim. App. 1984) (holding that nothing was preserved for appellate review when appellant did not cite authority and did not present argument on issue); *Russeau v. State*, 291 S.W.3d 426, 437 (Tex. Crim. App. 2009) (appellant failed to point out in record where he made argument to the trial court); *Tufele v. State*, 130 S.W.3d 267, 270-71 (Tex. App.—Houston [14th Dist.] 2004, no pet.). However, out of an abundance of caution, the State will address it.

### *Community Caretaking Standard of Review*

"'As a part of his duty to 'serve and protect,' a police officer may stop and assist an individual whom a reasonable person, given the totality of the circumstances, would believe *is in need of help*.'" *Gonzales v. State*, 369 S.W.3d 851, 854 (Tex. Crim. App. 2012) (emphasis in original). In evaluating a community-caretaking stop, courts will determine whether the officer was primarily motivated by the community-caretaking purpose and whether the officer's belief that the individual needed help was reasonable. *Id*. at 854-55. To determine the reasonableness of the officer's belief, the Court of Criminal Appeals proposed a non-exclusive list of factors to consider:

> (1) the nature and level of the distress exhibited by the individual; (2) the location of the individual; (3) whether or not the individual was alone and/or had access to assistance independent of that offered by the officer; and (4) to what extent the individual—if not assisted— presented a danger to himself or others.

*Id*. at 855. The first factor is generally accorded the greatest weight but is not always dispositive. *Id*. The unique facts of each case determine the result, and different factors may be inapplicable or have varying weights in a given case. *Id*.

In *Gonzales,* the officer observed the defendant's vehicle pull off the road just before 1:00 a.m. in an area with few business and little traffic. *Id*. at 853. When the officer decided to see if the driver needed assistance, he activated his traffic lights and began to pull onto the shoulder behind the defendant's vehicle. *Id*.

11

The defendant began to drive away, but quickly stopped. *Id.* When the officer approached to ask the defendant if he was okay, he noticed a strong odor of alcohol coming from the vehicle, and that the defendant's eyes were bloodshot and his speech was slurred. *Id.* The officer then began a driving-while-intoxicated investigation. *Id.*

The Court of Criminal Appeals observed that it would not second-guess the trial court's determination that the officer was primarily motivated by his public-safety role. *Id.* at 855. The Court deferred to the trial court's determination of that issue because it was highly dependent on credibility and demeanor. *Id.* The Court then evaluated the reasonableness of the officer's belief that the defendant needed help. First, it was reasonable based on the officer's observations and inferences to believe the defendant was experiencing some form of distress. *Id.* at 856. Second, the location compounded the defendant's distress, in that the events took place in a lightly populated area on the way out of town, with minimal traffic at that late hour. *Id.* Third, the defendant's location also limited his access to assistance. *Id.* The Court afforded little weight to the fourth factor – whether the unassisted defendant was a danger to himself or others – because of its awkward fit with the facts of that case. *Id.* at 856-57. The Court found that the officer's belief that the defendant needed help was reasonable under the totality of the circumstances. *Id.* at 857.

*Analysis*

Appellant appears to concede that Officer Tucker's initial check on Appellant was justified by the community caretaking exception. *See* Brief for Appellant at 19 (Appellant only contests Officer Flugrath's investigation). Furthermore, at the outset it is important to note that Appellant was not "seized" when Tucker first came to investigate and determine why he was parked on the tracks because Appellant was unconscious in his car (II R.R. at 10-12). *See Crain v. State*, 315 S.W.3d 43, 49 (Tex. Crim. App. 2010) (whereas an investigative detention occurs "when a person yields to the police officer's show of authority under a reasonable belief that he is not free to leave," a consensual encounter is not a seizure). Though Appellant's encounter with Tucker was not truly a "seizure" until sometime after Tucker learned of information warranting reasonable suspicion to conduct an investigative detention, even if it was a community caretaking "stop," it would have been justified on the extraordinary facts of the case.

There was ample support in the record for the trial court to determine that Tucker was primarily motivated by the community-caretaking function. See Statement of Facts at 2-6; II R.R. at 10 (Tucker testified that Appellant's car was close enough to the active railroad tracks that any train would have collided with it); *id*. at 12-13 ("Knowing that we had a danger involved," Tucker did not

13

immediately ask questions, instead escorting Appellant to safety). Because the trial court's implied finding on this issue is highly dependent on credibility and demeanor, the Court should defer to the trial court's finding in the State's favor. *See Garcia*, 43 S.W.3d at 530; *see also Gonzales*, 369 S.W.3d at 855.

When evaluating the reasonableness of the officer's belief that the defendant needed help, just as in *Gonzales*, the Appellant was located in a lightly-populated area at a late hour with relatively little traffic. *See* Defense Ex. 1 at 11:29:50 p.m. Over and above *Gonzales*, however, Tucker (and the private citizen who called the police) could infer distress from the fact that Appellant was parked on an active railroad track. *See id.*; II R.R. at 12-13. This potentially deadly location compounded Appellant's distress exponentially more than the mere "isolation" of the defendant in *Gonzales*. *Compare with* 369 S.W.3d at 856. Furthermore, while in both cases there was little chance of independent assistance, in Appellant's case, Tucker was aware of the fact that a private citizen had called the *police* to handle the issue. *See* II R.R. at 9, 18. This fact further established that – likely due to the inherent danger of the situation – there would be no intervention independent of the police. Finally, while in *Gonzales* the final factor was largely inapplicable, in Appellant's case, there was a clear danger that if left parked on the active track, Appellant was at serious risk of losing his life, not to mention a potential threat for bystanders, train passengers, or derailment. *See* 369 S.W.3d at 856-57. Every

14

single factor in the instant case is far more compelling than the circumstances found sufficient in *Gonzales*, and the Court should find that any community-caretaking stop of Appellant was likewise reasonable based on the totality of the circumstances. *See* 369 S.W.3d at 857.

**C.      Facts learned from Tucker's and Flugrath's observations of Appellant led to reasonable suspicion justifying an investigative detention.**

*Reasonable Suspicion Standard of Review*

The Supreme Court has noted that "[t]here is 'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.'" *Terry v. Ohio*, 392 U.S. 1, 21 (1968) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 534-37 (1967)). The reasonableness of a temporary detention must be considered in view of the totality of the circumstances and the cumulative information available at the inception of the encounter. *Tanner v. State*, 228 S.W.3d 852, 855 (Tex. App.—Austin 2007, no pet.); *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002) (overruled in part on other grounds by *Davis v. Washington*, 547 U.S. 813 (2006)). Courts must not isolate each fact and decide whether each one *independently* is consistent with innocent activity. *Arvizu*, 534 U.S. at 274.

Reviewing courts will factor in an officer's training and experience when evaluating whether he had reasonable suspicion to justify an investigative

15

detention. *Id*. at 276. The reviewing court will consider all information available to the officer at the time of the stop, including that obtained from his own observations or relayed to him by other members of law enforcement. *Hall v. State*, AP-75,121, 2007 WL 1847314, at *3 (Tex. Crim. App. June 27, 2007) (citing *Jackson v. State,* 745 S.W.2d 4, 11-17 (Tex. Crim. App. 1988)). Additionally, under the "collective knowledge" doctrine, the cumulative information available to several cooperating officers may be considered. *State v. Duran*, 396 S.W.3d 563, 574 n.12 (Tex. Crim. App. 2013) ("[T]he detaining officer need not be personally aware of every fact that objectively supports a reasonable suspicion to detain; rather, 'the cumulative information known to the cooperating officers at the time of the stop is to be considered in determining whether reasonable suspicion exists.'") (quoting *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011)).

Reasonable suspicion that criminal activity may be afoot must be based upon commonsense judgments and inferences about human behavior. *Tanner*, 228 S.W.3d at 855. Courts require only a "minimal level of objective justification" on the part of the officer. *Id*. (citing *U.S. v. Sokolow*, 490 U.S. 1, 7 (1989)). An officer's determination of the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard. *Tanner*, 228 S.W.3d at 856 (citing *Arvizu*, 534 U.S. at 274).

16

*Analysis*

Appellant apparently asserts that when Officer Flugrath arrived on the scene, he lacked information necessary to form reasonable suspicion to justify Appellant's investigative detention for DWI. Brief for Appellant at 19. However, Flugrath had ample information from his own observations and from Tucker to justify the temporary investigative detention.

Officer Tucker had been a police officer for around 12 years at the time of the offense (II R.R. at 9; IV R.R. at 52).[3] As detailed in the statement of facts, *supra* (at 2-7), Officer Tucker initially came upon Appellant passed out in his running car, which was parked on an active railroad track (VI R.R. at 6). When Tucker finally managed to wake him, Appellant was disoriented, was very unsteady on his feet, had bloodshot and glassy eyes, slurred his speech, and had a strong odor of alcohol coming from his person (*id*. at 6-7). Officer Flugrath arrived while Tucker was still speaking with Appellant, less than 10 minutes after Appellant woke up (Defense Ex. 1 at 11:31:22; *id*. at 11:41:15).[4]

_____

[3] The State went into the officers' training and experience in greater detail at trial. *See Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996) ("Where the State raises the issue at trial either without objection or with subsequent participation in the inquiry by the defense, the defendant has made an election to re-open the evidence, and consideration of the relevant trial testimony is appropriate in our review").

[4] One court of appeals found a 27-minute delay while merely *waiting* for another officer reasonable:

> Legitimate law enforcement purposes include a delay to permit the arrival of a DWI enforcement officer so that the supervisory officer initiating the stop can return to duty, a delay for the arrival of a video camera so that the DWI investigation and the field sobriety tests can be taped in accordance with

Officer Flugrath had been employed as a patrol officer since 1995 (II R.R. at 39) and testified that he had probably conducted over a thousand DWI stops in his career (IV R.R. at 85-86). Flugrath discussed the situation with Tucker – including the fact that Appellant was parked on the tracks – before Flugrath set up his patrol car and camera for sobriety testing (II R.R. at 35, 37; *see also* VI R.R. at 10 (Flugrath states in his report he spoke with Tucker and verified certain facts about the incident). The trial court could reasonably infer that Tucker relayed his other observations to Flugrath. *See Gonzales*, 369 S.W.3d at 854. Because Flugrath could rely on the information Tucker gave him – along with his own personal observations that Appellant was looking down and was very disoriented (II R.R. at 35), smelled strongly of alcohol and had bloodshot and glassy eyes (*id*. at 36-38) – Flugrath had reasonable suspicion sufficient to justify his investigative detention and sobriety testing. *See Hall*, 2007 WL 1847314, at \*3; *Duran*, 396 S.W.3d at 574 n.12; *Wiegand*, 1999 WL 546844, at \*1.

Based on the forgoing facts, an officer as experienced with DWI's as Flugrath  could reasonably infer there was a substantial chance Appellant – who was sleeping while parked on the railroad track – had been driving while intoxicated. *See also* The Evidence Was Legally Sufficient, *infra* (at 25). The

---

department procedures, and a delay for the arrival of a rookie officer who needs training.
*Belcher v. State*, 244 S.W.3d 531, 540-41 (Tex. App.—Fort Worth 2007, no pet.).

18

Court should give due weight to the trial court's implied finding that Officers Tucker and Flugrath were credible and that their inferences were reasonable. *See Tanner*, 228 S.W.3d at 857; *Gonzales*, 369 S.W.3d at 854. When Flugrath took over the investigation, if he had **not** further investigated the situation – with all the cumulative evidence available to him at that point – it would have been poor police work. *See Tanner*, 228 S.W.3d at 859 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). The record supports the trial court's conclusion that Flugrath had reasonable suspicion that Appellant had been driving while intoxicated, based on commonsense inferences about human behavior in the context of the totality of information available to him.

## Miranda Warnings Are Not Required at the Outset of an Investigatory Detention

### *Summary of the Argument*

Appellant argues that because Officer Tucker believed he would undertake a DWI investigation, he should have immediately given Miranda warnings. However, even if Appellant had adequately preserved his point of error, Miranda warnings are not required for investigative detentions. Furthermore, in Appellant's case, even if all of Appellant's testimonial statements had been suppressed, the remaining overwhelming evidence would still have led to his conviction.

## *Argument*

In Appellant's second point of error, he complains that trial court erred in failing to grant his broad motion to suppress "all written and oral statements made by Defendant to any law enforcement officers or others in connection with this case, and any testimony by the San Antonio Police Department or any other law enforcement officers or others concerning any such statements." I C.R. at 46; *see also* Brief for Appellant at 21. Appellant claims that officers never observed a traffic offense, and the fact that questioning occurred at night on the side of the road meant Appellant was interrogated during a custodial interrogation. Brief for Appellant at 24. Specifically, Appellant asserts that Tucker's belief that there would be a DWI investigation at the time he removed Appellant from his car means that Tucker should have read the Miranda warnings before he proceeded any further. *Id.* at 12.

First, Appellant's overbroad motion to suppress "all … statements made by Defendant to any law enforcement officers or others" (I C.R. at 46) is not *specific* as to the objectionable statements Appellant wished to suppress, nor did Appellant identify for the trial court (or this Court)[5] any particular statement he wished to

---

[5] *See* Tex. R. App. P. 33.1(a), 38.1(h), (i); *Smith v. State,* 683 S.W.2d 393, 410 (Tex. Crim. App. 1984) (holding that nothing was preserved for appellate review when appellant did not cite authority and did not present argument on issue); *Russeau v. State*, 291 S.W.3d 426, 437 (Tex. Crim. App. 2009) (appellant failed to point out in record where he made argument to the trial court); *Tufele v. State*, 130 S.W.3d 267, 270-71 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

20

suppress. *See Hernandez v. State*, 599 S.W.2d 614, 617 (Tex. Crim. App. 1980) (op. on reh'g) (observing that even if that appellant's "objection sufficiently stated grounds for the objection, it did not identify what was objected to."); *see also* Tex. R. Evid. 103(a)(1) (requiring a specific objection). Because at least some of Appellant's statements were admissible (e.g., statements made while the Tucker was trying to get Appellant and his Cadillac safely off the tracks), Appellant's failure to point out for the trial court which statement was inadmissible – based on what particular ground – waived error. *See Garza Gonzalez v. State*, 783 S.W.2d 774, 778 (Tex. App.—Corpus Christi 1990, no pet.) (observing the appellant failed to adequately raise his complaint in the trial court, noting that "the necessity of presenting a specific objection with supporting grounds is particularly important in a case such as this one where the accused made more than one statement"); *see also* II R.R. at 53-55 (where Appellant did not point out specific statements or grounds to support suppression of those statements).

Second, as discussed *supra* (at *9-10), Tucker observed that Appellant was parked in violation of Texas Transportation Code § 545.302. The mere fact that the investigatory detention occurred on the side of the road at night (Brief for Appellant at 24) does not transform the situation into a custodial interrogation. *See State v. Waldrop*, 7 S.W.3d 836, 839 (Tex. App.—Austin 1999, no pet.) (statements made during an investigatory detention on the roadside after midnight

21

were not part of a custodial interrogation). Appellant failed to adequately explain to the trial court how any of his statements were made during a "custodial interrogation." *See Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007) ("At trial, the defendant bears the initial burden of proving that a statement was the product of 'custodial interrogation'").

Furthermore, Appellant's complaint on appeal that Tucker's belief there would be a DWI investigation somehow necessitated a Miranda warning (Brief for Appellant at 12, 24) was not presented to the trial court (II R.R. at 53-55). *See Garza Gonzales*, 783 S.W.2d at 778 (because the appellant's complaint in the trial court did not comport with that raised on appeal, "nothing is preserved for review"). Notably, even if such a complaint had been adequately presented to the trial court, the trial court would not have erred in rejecting it. *See Hernandez v. State*, 107 S.W.3d 41, 48 (Tex. App.—San Antonio 2003, pet. ref'd) (investigatory detentions do not require Miranda warnings); *Abernathy v. State*, 963 S.W.2d 822, 824 (Tex. App.—San Antonio 1998, pet. ref'd) (observing the Supreme Court had held that a "motorist was not in custody for purposes of *Miranda* even though the traffic officer 'apparently decided as soon as [the motorist] stepped out of his car that [the motorist] would be taken into custody and charged with a traffic offense'"); *Simmons v. State*, 14-07-00301-CR, 2008 WL 2580380, at *3 (Tex. App.—Houston [14th Dist.] July 1, 2008, no pet.) (not designated for publication)

22

("the right to *Miranda* warnings is not triggered during an investigative detention").

Finally, even if Appellant had preserved his issues and the trial court had erred in admitting one of Appellant's multiple statements, in light of the other overwhelming evidence of Appellant's guilt, any error would have had no – or only slight – influence on the verdict, and would be harmless. *See Mitten v. State*, 228 S.W.3d 693, 696 (Tex. App.—Corpus Christi 2005, pet. ref'd, untimely filed). As discussed in the Statement of Facts, *supra*, Appellant was discovered slumped over his center console, sleeping, while parked on an active railroad track. When Tucker finally managed to wake him up, Appellant was sluggish, disoriented and incoherent (*see*, *e.g.*, IV R.R. at 57). Officers noticed the strong odor of metabolized alcohol coming from Appellant (IV R.R. at 59, 90-91). Appellant struggled to put his flip-flop on (State's Ex. 2 at 11:32:10; IV R.R. at 58). He had obvious problems with his balance, having to use vehicles as a crutch and needing the officer's assistance to walk (IV R.R. at 58). Appellant slurred his speech, and his eyes were bloodshot and glassy (*id*. at 62).

Furthermore, Appellant failed or refused to perform several sobriety tests, often giving outlandish explanations for his refusals. Statement of Facts, *supra* (at 6-7). Such tests do not implicate *Miranda*:

> The court of criminal appeals has held that sobriety tests yield physical evidence of a suspect's mental and physical faculties, and

23

thus, the results are not testimonial evidence that implicates *Miranda. Gassaway v. State,* 957 S.W.2d 48, 51 (Tex.Crim.App.1997) (holding that field sobriety tests do not violate the privilege against self-incrimination). Specifically, the court of criminal appeals has reasoned that field sobriety tests are not testimonial because their results do not create "an express or implied assertion of fact or belief." *Id*.

*Jordan v. State*, 2-05-364-CR, 2006 WL 2310531, at \*2 (Tex. App.—Fort Worth Aug. 10, 2006, no pet.). *Jordan* also observed that no statute requires warnings prior to the administration of field sobriety tests. *Id*. at \*3 (citing *Martin v. State*, 97 S.W.3d 718, 720 (Tex. App.—Waco 2003, pet. ref'd). Appellant also refused to give a voluntary sample of his blood (State's Ex. 3-A at 12:05:30, 12:09:55).[6]

Officers found a container of rum missing ¼ of its contents in the vehicle, an amount which Tucker observed was insufficient to render Appellant as drunk as he was (State's Ex. 2 at 12:12:24). Flugrath – who estimated he had conducted over 1,000 DWI investigations (IV R.R. at 85-86) – testified that in his opinion

---

[6] The trial court erred in suppressing warrantless blood-draw evidence based on *The State of Texas vs. David Villareal*; this will be particularly evident if the Court of Criminal Appeals determines on rehearing that the blood draw statute at issue is constitutional (I C.R. at 146, citing P.D. 0306-14; *see also* Order Suppressing, *attached*). *State v. Villarreal*, PD-0306-14, 2014 WL 6734178, at \*1 (Tex. Crim. App. Nov. 26, 2014), *reh'g granted* (Feb. 25, 2015). The State therefore appeals the following cross point: the trial court erred in ruling that suppression was mandated based on *Villareal*, 2014 WL 6734178. *See* Tex. Crim. Proc. Code Ann. § art. 44.01(c) (West, Westlaw through 2015 Sess.) ("the state is entitled to appeal a ruling on a question of law if the defendant is convicted and appeals the judgment"); *see also* II R.R. at 60 (where the trial court would have denied suppression of the blood draw before it subsequently granted suppression based solely on the *Villareal* case). In the event the Court finds the trial court did err in this respect, the blood-draw evidence Appellant fought to suppress would be one more factor contributing to the already overwhelming evidence of Appellant's guilt.

24

Appellant had been so intoxicated that he had lost the normal use of his mental faculties when Appellant drove and parked his vehicle on the tracks (*id*. at 107 (**State**: "Do you have an opinion as to whether or not he lost [the normal use of his mental faculties]?".... **Flugrath**: "I don't believe a normal person would park their car that close to a railroad track without any type of vehicle difficulty....").

Though Appellant fails to specify which testimonial statements should have been suppressed, even absent *any* of his testimonial statements, in light of the overwhelming evidence of Appellant's guilt, the jury's verdict would have been the same. For all of the foregoing reasons, the Court should reject Appellant's second point of error.

## The Evidence Was Legally Sufficient to Convict Appellant of Operating a Motor Vehicle in a Public Place

### *Summary of the Argument*

In points of error three through five, Appellant claims the evidence was legally insufficient to show that he operated a motor vehicle in a public place without the normal use of his faculties. However, the overwhelming evidence – and reasonable inferences from that evidence – easily allowed the jury to conclude that Appellant was guilty of Driving While Intoxicated. Because it cannot be said

25

that *no* reasonable jury would have convicted Appellant based on the evidence at trial, the Court should affirm Appellant's conviction.

### *Legal Sufficiency Standard of Review*

After the decision of the Court of Criminal Appeals in *Brooks v. State*, Texas appellate courts review legal and factual sufficiency challenges in criminal cases using the same legal sufficiency standard of review. *Kiffe v. State*, 361 S.W.3d 104, 107 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (citing *Ervin v. State,* 331 S.W.3d 49, 54 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd)). Evidence is only insufficient if, when considering all the evidence in the light most favorable to the verdict, "no rational factfinder could have found each essential element of the charged offense beyond a reasonable doubt." *Id.*[7] (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

When reviewing the legal sufficiency of the evidence, a reviewing court "considers all evidence in the record of the trial, whether it was admissible or inadmissible." *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013), *reh'g denied* (Apr. 17, 2013). Courts will treat direct and circumstantial evidence equally. *Kiffe*, 361 S.W.3d at 108. "[D]irect evidence of a fact, standing alone and

---

[7] When viewing the evidence in the light most favorable to the verdict, evidence can be insufficient in two circumstances: when the record contains "no evidence, or merely a 'modicum' of evidence, probative of an element of the offense" **or** when "the evidence conclusively establishes a reasonable doubt." *Id*. The evidence may also be insufficient when the acts alleged do not constitute the offense charged. *Id*. at 108.

if believed by the jury, is always… sufficient to prove that fact." *Cortez v. State*, 08-02-00363-CR, 2004 WL 178587, at \*3 (Tex. App.—El Paso Jan. 29, 2004, pet. ref'd) (citing *Goodman v. State*, 66 S.W.3d 283, 286 (Tex. Crim. App. 2001)). Furthermore, "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Rockwell v. State*, AP-76,737, 2013 WL 6529575, at \*1 (Tex. Crim. App. Dec. 11, 2013) (not designated for publication) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)), *cert. denied,* 134 S. Ct. 2724 (2014).

Legal sufficiency review "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Each fact in isolation need not establish the guilt of the accused. *Roberson v. State*, 16 S.W.3d 156, 164 (Tex. App.—Austin 2000, pet. ref'd). Reviewing courts will determine whether the necessary inferences are reasonable based on the "combined and cumulative force of the evidence when viewed in the light most favorable to the verdict." *Kiffe*, 361 S.W.3d at 108. Appellate courts will presume that the factfinder "resolved any conflicting inferences in favor of the verdict" and defer to that resolution. *Id*. The reviewing courts will also defer to "the factfinder's evaluation of the credibility and the weight of the evidence." *Id*. The factfinder is

entitled to accept some testimony and reject other testimony, in whole or in part. *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000), abrogated on other grounds by *Laster v. State*, 275 S.W.3d 512 (Tex. Crim. App. 2009); *see also Roberson*, 16 S.W.3d at 164 (factfinder may accept or reject any or all evidence presented by either party).

Ultimately, the reviewing court is not to determine "whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt," but whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 318-19 (emphasis in original). Accordingly, "the verdict will be sustained if there is any evidence which, if believed, shows the guilt of the accused." *Brown v. State*, 649 S.W.2d 160, 163 (Tex. App.—Austin 1983, no pet.).

### *Argument*

Appellant contends there was legally insufficient evidence to show Appellant operated a motor vehicle in a public place while intoxicated. Although Appellant breaks his argument up into three separate points of error, because the cumulative evidence to support each element is largely duplicative, the State will

answer points of error three through five in the same section to avoid excessive repetition.

Appellant points out that officers did not personally see Appellant driving on a public road while he was intoxicated. Brief for Appellant at 27. Notably, Tucker did observe him turn the vehicle off after he woke Appellant (IV R.R. at 64). Regardless, the fact that an officer may not have personally observed every element of the offense does not render the evidence legally insufficient. *See Rockwell*, 2013 WL 6529575, at *1 ("circumstantial evidence alone can be sufficient to establish guilt"); *Kirsch v. State*, 357 S.W.3d 645, 650-51 (Tex. Crim. App. 2012) (the Court of Criminal Appeals has concluded that "a person 'operates' a vehicle when 'the totality of the circumstances [] demonstrate that the defendant took action to affect the functioning of his vehicle in a manner that would enable the vehicle's use").

In *Priego v. State*, the appellant testified that after she obtained two whiskey bottles from another person, she drove to the parking lot of C W Ford Rentals near a dumpster. 457 S.W.3d 565, 567 (Tex. App.—Texarkana 2015), *petition for discretionary review refused* (June 3, 2015). The appellant claimed she consumed one bottle while the truck was in the parking lot, threw it in the dumpster, and began drinking from the second bottle until she lost consciousness. *Id*.

A manager of the rental company noticed the appellant's truck in the otherwise empty parking lot. *Id*. When he approached and knocked on her window, the appellant was unresponsive. *Id*. When no one could wake the appellant, she was eventually transported to a hospital where her blood was drawn. *Id*. at 568. No field sobriety tests were administered. *Id*. n.3. The manager "never saw [the appellant] actually drive the truck, which was parked straight in the parking lot." *Id*. at 568.

After the appellant's conviction, she contested the legal sufficiency of the evidence that she had operated her vehicle while intoxicated. *Id*. at 569. She contended that "she did not consume any alcohol before she parked her truck in the parking lot of C W Ford Rentals and that there is no direct or circumstantial evidence which would enable a reasonable fact-finder to determine otherwise." *Id*.

Among other facts, the court of appeals observed that there was no evidence in the record suggesting anyone else had operated the appellant's vehicle. *Id*. at 570. The appellant's car had been parked in the lot for around an hour when the officer was first dispatched to the scene. *Id*. A partially consumed whiskey bottle was found on the truck's floorboard, and the appellant smelled strongly of alcohol. *Id*. Although the gear selector was in "park," the engine was running and the appellant was still wearing her seatbelt. *Id*. Despite the fact that there was no direct evidence that the appellant "became intoxicated prior to or during the time she was

30

driving the truck, the jury could reasonably infer that she was operating her truck while intoxicated." *Id*. Considering the evidence in the light most favorable to the verdict, the court of appeals found the evidence legally sufficient. *Id*. at 571.

In Appellant's case, there was extensive evidence that Appellant was highly intoxicated while operating his vehicle in a public place. Statement of facts, *supra* (at 2-7). While in *Priego* there was no evidence anyone else had operated the appellant's vehicle, in the instant case Appellant admitted that no one else was in the vehicle with him and that he was driving (IV R.R. at 92). At 11:48:33 p.m., Appellant stated it was "about 11:30 now," and that he had driven from his friend's house around "10:30" – around one hour earlier, just as in *Priego* (State's Ex. 3-A at 11:48:33; *see also* State's Ex. 2 at 11:29:50 (Tucker arrives at the scene)). Further mirroring *Priego*, a partially consumed liquor bottle was found in Appellant's floorboard (IV R.R. at 63). Appellant's gear selector was in "park," the engine was running, and Appellant was sitting in the driver's seat and slumped over the center console, sound asleep.[8] *Compare with Priego*, 457 S.W.3d at 570.

---

[8] Appellant contrasts the particular facts constituting legally sufficient evidence in other cases with the facts in his case. Brief for Appellant at 28 (e.g. "There is no evidence of the vehicle's transmission being engaged, as in *Dornbusch v. State*"); *but see Priego*, 457 S.W.3d at 570 (gearshift in "park"); *Hearne v. State*, 80 S.W.3d 677, 679 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (gearshift in "park"). In any event, Appellant conflates sufficiency with necessity – although a given fact may help constitute legally sufficient evidence in one case, it is not thereafter required to be proved in every subsequent case. *Cf. Tanner*, 228 S.W.3d at 858 (citing *Ornelas v. U.S.*, 517 U.S. 690, 698 (1996) (warning that in the context of reasonable suspicion determinations, courts should avoid comparing the individual facts in one case to the treatment of similar facts in other cases).

31

Additionally, whereas the appellant in *Priego* never underwent field sobriety tests, video of Appellant's various attempts and refusals to complete such tests were in evidence before the jury. *See* Statement of Facts, *supra* (*e.g.,* State's Ex. 3-A at 11:58:50 (Appellant refused to perform one-legged stand because he could not balance without 200-pound weights on his shoulders)). While the appellant in *Priego* claimed that she only drank in the parking lot – and further argued there was nothing in evidence to the contrary – Appellant admitted to drinking at his friend's house before driving to the railroad track (State's Ex. 3-A at 11:50:55 (when asked how much he had to drink there, Appellant replied "enough")). Furthermore, in addition to his slurred speech and demeanor, jurors could watch Appellant's various apologies and admissions of culpability. Statement of Facts, *supra* (*e.g.*, State's Ex. 2 at 11:40:24 (Appellant said he'd had "[t]oo much" to drink); *id*. at 11:44:13 ("I know I messed up. I apologize."); State's Ex. 3-A at 11:47:48 ("I know I'm in trouble" and "I'm the worst")). This evidence – over and above that found sufficient by the Texarkana court of appeals – must also be considered in light of the most profound circumstance elevating Appellant's case over *Priego*: whereas Priego parked her vehicle "straight in [a] parking lot," Appellant parked his Cadillac on an active railroad track.

The jury could reasonably infer that when Appellant drove to and parked his Cadillac on the active railroad track, he had lost the normal use of his mental

32

faculties. *Cf. Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010) ("Being intoxicated at the scene of a traffic accident in which the actor was a driver is some circumstantial evidence that the actor's intoxication caused the accident, and the inference of causation is even stronger when the accident is a one-car collision with an inanimate object"). Parking in such circumstances could lead to two inferences – either the Appellant had lost the normal use of his mental faculties when he drove and parked there, or he was suicidal. *See* II R.R. at 55 (where Appellant tried to argue during the pretrial motion to suppress that it may have been a suicide attempt). However, when Officer Tucker pointed out that if a train had come, Appellant probably would have been killed, Appellant stated "I didn't want that" (State's Ex. 2 at 11:40:20). *See also* State's Ex. 3-A ("Apparently I made a mistake because if I was on a railroad track I apologize.").

Accordingly, given the totality of the evidence at trial, the jury made what was the *only* reasonable inference: that Appellant – by virtue of his intoxication – had lost the normal use of his mental faculties when he drove and parked his Cadillac on the train tracks before passing out. When viewing the combined and cumulative force of the evidence in the light most favorable to the prosecution, it cannot be said that the factfinder's inferences were not reasonable.

Appellant also contends the evidence was legally insufficient to prove he operated his vehicle in a "public place;" he claims the allegedly "private" railroad

easement does not qualify. Brief for Appellant at 30. However, as mentioned *supra*, the jury could reasonably infer that Appellant operated his vehicle in another public place: he drove on the public road from which he reached the railway easement. As the State observed during the hearing on the motion to suppress, "unless [Appellant] has some magic trick, he had to drive to that spot. So he was on public roadways to get there" (II R.R. at 56).

Moreover, even if the evidence only showed Appellant had driven on the "private railway easement," several of Appellant's cited cases demonstrate this falls under the "public place" definition. Appellant cites *Shaub v. State*, observing that "[i]n determining whether a place is public, the relevant inquiry is whether the public has access to it." Brief for Appellant at 29 (citing 99 S.W.3d 253, 256 (Tex. App.—Fort Worth 2003, no pet.). The public has access to several locations which are privately owned; this fact is readily apparent in the Penal Code's definition of "public place."

As defined in the Penal Code, a "public place" means "any place to which the public or a substantial group of the public has access and includes, but is not limited to, streets, highways, and the common areas of schools, hospitals, **apartment houses**, **office buildings**, transport facilities, and **shops**." Tex. Pen. Code Ann. § 1.07(a)(40) (West, Westlaw through 2015 R.S.) (emphasis added). The emphasized examples are privately owned, yet nevertheless classified as

34

"public places." Indeed, in Appellant's cited case *Shaub v. State*, the "public place" at issue appears to have been a privately leased marina. *See* 99 S.W.3d at 255. Appellant cites several similar cases involving privately owned areas – some of which involved restricted access – which were nevertheless classified as "public places." Appellant observes several such fact patterns on page 30 of his brief; he explicitly notes of one of them that:

> The manager of the complex testified that the entire complex was surrounded by a metal fence, that the complex had between 200 and 300 residents, and that the parking lot was a common area for the complex. When a resident moved into the complex, the resident received a "gate card" which would electronically trigger the gate.

*Brief for Appellant at 30 (citing Holloman v. State*, 11-95-275-CR, 1995 WL 17212433, at *1 (Tex. App.—Eastland Dec. 21, 1995, pet. ref'd) (not designated for publication) (the court found said location to be a "public place" for purposes of § 49.04 of the Texas Penal Code)).

Appellant nevertheless tries to distinguish his case, asserting that the record is "devoid of testimony that would reasonably support a finding that the private railway easement away from the roadway was plainly open to the public." *Id*. Appellant's assertion is flatly incorrect. First, State's Exhibit 2 clearly shows Appellant's vehicle located around 20 feet off the public roadway (State's Ex. 2 at 11:29:50). The jury could see for itself that there were no fences or other obstructions; Appellant had merely pulled of the road a few steps behind his

35

vehicle. *Id*.[9] Second, there was explicit testimony at trial that the railroad was a "public place:"

> State:   "Is … the railroad a public place?"

> Tucker:   "Yes ma'am, it is."

(IV R.R. at 60).

The State belabored the point a short while later:

> State:   "…it was your judgment call, your opinion, that this private Union Pacific property was a public place. …. Union Pacific easement was a public place?"

> Tucker:   "Yes."

(*id*. at 70). The State actually had Officer Tucker explain that private property could be a public place (*id*. at 74-76 (Tucker: "If you can walk there without any barriers or no trespassing signs, it's usually a public place" State: "So is that railroad track off FM 306 considered a public place?" Tucker: "Yes, ma'am, it is.")). For all the foregoing reasons, the Court should find the evidence was legally sufficient to support the jury's finding that Appellant operated his vehicle in a public place while he was intoxicated. Because it cannot be said that *no* rational

---

[9] Appellant's comparison to *Fowler* – where the appellant was on a gated (albeit open) unpaved private residence's driveway ¼ mile from a country road – is therefore inapposite. *Fowler v. State*, 65 S.W.3d 116, 117 (Tex. App.—Amarillo 2001, no pet.). The only testimony in *Fowler* that the road was a "public place" was struck from the record. *Id*. at 119. Additionally, unlike *Fowler*, in the instant case Appellant stated on video that he had left his friend's house around 10:30 p.m. after drinking, and that he remembered driving over the railroad crossing. Statement of Facts, *supra*.

trier of fact could have found Appellant guilty – particularly in light of the combined and cumulative force of the overwhelming evidence in this case – the Court should defer to the jury's determination and affirm the judgment of the trial court. *See Jackson*, 443 U.S. at 318-19.

## Appellant's Sentence Did Not Violate the Constitutional Prohibition on Cruel and Unusual Punishment

### *Summary of the Argument*

Appellant argues his life sentence was grossly disproportional and constitutes cruel and unusual punishment. However, in light of the fact that several other cases – which Appellant acknowledges in his brief – have upheld such sentences in similar circumstances, and because Appellant presents no novel arguments or compelling reasons for the Court to ignore such precedents, his final point of error should likewise be rejected.

### *Facts at Punishment*

As the State showed in the punishment phase of Appellant's trial, Appellant had an extensive, serious and potentially deadly problem with alcohol. Appellant's sister testified on his behalf at the punishment phase (V R.R. at 50). On cross-examination, she admitted Appellant completely lacked self-discipline (*id*. at 54). She acknowledged he had a "severe" alcohol problem (*id*.). She recognized the

severity of his problem despite the fact that she was not aware the instant case was his sixth DWI conviction (*id.*). Appellant's sister further acknowledged that the State's repeated attempts to rehabilitate her brother had failed (*id.* at 55). She did not seem to be aware of the fact that he was on parole when he picked up his fifth DWI (*id.* at 56). She did recognize that Appellant's "supportive" family had never been enough to keep Appellant from re-offending (*id.* at 56-57). Appellant's sister apparently had not been told that he was parked on a train track for his latest DWI; when confronted with that information, she clearly had additional reservations about Appellant (*id.* at 58). Appellant's sister further acknowledged that Appellant had endangered his own life and the life of others on each of the six occasions for which he was convicted of driving while intoxicated (*id.* at 59). Ultimately, although she wished to help her brother, Appellant's sister had to admit that when her oldest daughter turned 16, she would want her to be safe from people like Appellant (*id.* at 59-60).

### *Argument*

Appellant acknowledges that his final point of error – that his sentence is grossly disproportionate and constitutes cruel and unusual punishment – has been rejected by the Third Court of Appeals and other courts. Brief for Appellant at 34-35. In *Davidson v. State*, the Court expressly observed that a sentence of life imprisonment in the context of cases such as Appellant's is not disproportionate.

*See* 03-13-00708-CR, 2014 WL 3809813, at \*1 (Tex. App.—Austin Aug. 1, 2014, no pet.) (not designated for publication). In *Davidson*, the Court observed that "[b]ased on [the appellant's] repeated commission of the offense of driving while intoxicated, a dangerous offense that placed her life and the lives of others in jeopardy, we could not conclude that a sentence of life imprisonment was grossly disproportionate to the offense so as to constitute cruel and unusual punishment." *Id*. The Court further noted that "[i]t is well established that a sentence of life imprisonment or of similar length is not grossly disproportionate to a felony offense that is committed by a habitual offender, even when the felony is not inherently violent in nature." *Id*. (citing *Rummel v. Estelle*, 445 U.S. 263, 284-85 (1980)); *see also Pryor v. State*, 03-13-00347-CR, 2015 WL 2066228, at \*5 (Tex. App.—Austin May 1, 2015) (not designated for publication), *petition for discretionary review filed* (Aug. 6, 2015) (where the Court noted under the "certainty of punishment" factor of its harmless error analysis that – given that appellant's history of DWI's – the jury would have assessed the maximum sentence in any event).

Appellant provides no new argument to support his point of error beyond his bare assertion that a life sentence is grossly disproportionate. Brief for Appellant at 35; *see also supra* (at 21 n.5). In light of the above, including Appellant's repeated violations, his endangerment of himself and others, and caselaw Appellant

acknowledges in his brief (Brief for Appellant at 34-35), any further historical analysis should be unnecessary. *See Davidson,* 2014 WL 3809813. However, in the event it interests the Court, the remainder of the instant brief – adapted from a colleague's – will trace some of the developments in caselaw related to the Eighth Amendment. Otherwise, for the foregoing reasons, Appellant's conviction should be, in all things, affirmed.

**Appellant's Sentence Is Consistent With Historical Developments in Eighth Amendment Case Law.**

*United States Supreme Court Precedent*

The United States Supreme Court has decided several cases determining whether the length of a non-capital prison sentence is properly subject to review in the context of the Eighth Amendment. Those cases cover both sentences that were assessed for a single offense as well as those assessed as part of a habitual offender statute. The Supreme Court itself has indicated that its decisions have been far from clear. While somewhat lengthy, the following summary will set out the facts and holdings of the Supreme Court's cases and provide additional support for the determination that Appellant's sentence does not violate the Eighth Amendment.

In *Graham v. West Virginia*, 224 U.S. 616 (1912), the facts reflected that, in 1898, the defendant had been convicted of stealing a horse valued at $50. Three years later, in 1901, he had been convicted of entering a stable in order to steal a

40

horse valued at $100. Finally, in 1907, the defendant was convicted of stealing a horse valued at $75 and various tack and accessories valued at $85. Upon conviction for that last crime, the defendant was sentenced to a term of life imprisonment as mandated by West Virginia's recidivist statute.

On appeal, the defendant claimed that cruel and unusual punishment had been inflicted upon him. In response, the United States Supreme Court noted, "The propriety of inflicting severer punishment upon old offenders has long been recognized in this country and in England. They are not punished the second time for the earlier offense, but the repetition of criminal conduct aggravates their guilt and justifies heavier penalties when they are again convicted." *Graham v. West Virginia*, 224 U.S. 616 at 623. Without any discussion of factors such as the severity of the offense or the possibility of parole, the Supreme Court concluded that it could not be maintained that cruel and unusual punishment had been inflicted. *Id*. at 631.

In *Rummel v. Estelle*, 445 U.S. 263 (U.S. 1980), the defendant had been charged in 1964 with fraudulent use of a credit card to obtain $80 worth of goods or services, a felony punishable by imprisonment for not less than two nor more than ten years. The defendant pled guilty and was sentenced to three years' confinement. In 1969, the defendant was charged with passing a forged check in the amount of $28.36, a felony punishable by imprisonment for not less than two

nor more than five years. The defendant also pled guilty to that offense and was sentenced to four years' imprisonment. Finally, in 1973, the defendant was charged with obtaining $120.75 by false pretenses, a felony punishable by confinement for not less than two nor more than ten years. However, the defendant was prosecuted under Texas' repeat offender statute and his two prior convictions were alleged in the indictment. A jury convicted the defendant of felony theft and also found the allegations that he had been convicted of two prior felonies were true. As a result, the trial court imposed a life sentence upon the defendant as mandated by law.

On appeal, the defendant argued that a sentence of life imprisonment was "grossly disproportionate" to the three felonies that formed the predicate for his sentence and, therefore, his sentence violated the Eighth Amendment's ban on cruel and unusual punishments. Eventually, the defendant's case reached the United States Supreme Court on certiorari. *Rummel v. Estelle*, 445 U.S. 263 at 265. Addressing the defendant's claim that the absence of violence in his crimes should militate against the imposition of such a severe sentence, the United States Supreme Court rejected that proposition by stating, "But the presence or absence of violence does not always affect the strength of society's interest in deterring a particular crime or in punishing a particular criminal." *Id*. at 275. The Court also found that the interest of the State of Texas in the case was not simply the punishment of the unlawful acquisition of another person's property. The Court recognized that there

42

was an additional interest, expressed in all recidivist statutes, in dealing more harshly with those who, by repeated criminal acts, have shown that they are simply incapable living as law-abiding citizens. *Id*. at 276. The Supreme Court also noted that Texas had a relatively liberal policy of granting "good time" credits to its prisoners, a policy that had historically allowed a prisoner serving a life sentence to become eligible for parole in as little as 12 years. In light of such policies, the Court recognized that a proper assessment of Texas' treatment of the defendant could hardly ignore the possibility that he would not actually be imprisoned for the rest of his life. *Id*. at 280. Finally, the Court noted that, even if the sentence imposed on the defendant was the most severe sentence found in any of the states, such fact would not necessarily make the defendant's sentence grossly disproportionate to his offenses. *Id*. at 282. The Court also clearly recognized that the Texas Legislature was entitled to make its own judgments on what sentences should be imposed for different crimes. *Id*. at 284. The Supreme Court then held that the mandatory life sentence imposed upon the defendant did not constitute cruel and unusual punishment under the Eighth Amendment.

In *Hutto v. Davis*, 454 U.S. 370 (U.S. 1982), officers had tape-recorded a transaction in which the defendant had sold marijuana and other controlled substances to a police informant. Several days later, on October 26, 1973, law enforcement officers raided the defendant's home and seized approximately nine

43

ounces of marijuana and assorted drug paraphernalia. The defendant was convicted in a Virginia state court for possession with intent to distribute and distribution of marijuana. The jury imposed a prison term of 20 years and a fine of $10,000 on each of the two counts and the prison terms were ordered to run consecutively. *Id*. at 370-371.

The defendant filed a writ of habeas corpus asserting that a 40-year sentence was so grossly disproportionate to the crime of possessing less than nine ounces of marijuana that it constituted cruel and unusual punishment as proscribed by the Eighth Amendment. The District Court relied primarily upon the four factors set forth in *Hart v. Coiner*, 483 F.2d 136 (4th Cir. 1973) to analyze the defendant's claim. *Hutto v. Davis*, 454 U.S. 370 at 371. Applying the first *Hart* factor to the case, the District Court found "no element of violence and minimal, debatable danger to the person." On *Hart*'s second factor, which called for an examination of the purposes behind the criminal statute and the existence of less restrictive means of effectuating those purposes, the District Court was inconclusive, but noted that the amount of marijuana involved was less than nine ounces, implying that such minimal possession could adequately be deterred with shorter prison sentences. Applying the third *Hart* factor, the District Court found that defendant's sentence for possession with intent to distribute exceeded the maximum penalty available for that offense in all but four States, and that his sentence for distribution

44

exceeded the maximum penalty available for that offense in all but eight States. Finally, under the fourth *Hart* factor, the District Court concluded that the defendant's sentence was disproportionate when compared to punishments applicable to other offenses under Virginia law. *Id*. at 373. Based on that analysis, the District Court granted the defendant's writ. *Id*. at 371. The District Court's decision was subsequently upheld by the United States Court of Appeals for the Fourth Circuit. *Id*. at 372.

The United States Supreme Court granted certiorari and addressed the application of the *Hart* factors by the lower courts. *See Hutto v. Davis*, 454 U.S. 370 (U.S. 1982). The Court specifically found that it had rejected each of the *Hart* factors in its opinion in *Rummel*. Addressing the application of the first *Hart* factor, the Supreme Court noted that, in *Rummel*, it had held that the presence or absence of violence did not always affect the strength of society's interest in deterring a particular crime or in punishing a particular criminal. The Court then found that the application of the second *Hart* factor had been implicitly rejected in *Rummel* by its conclusion that the amount of money taken was not relevant, because to have acknowledged that the State could have given the defendant a life sentence for stealing some amount of money would have conceded that the lines to be drawn were subjective and therefore properly determined by legislatures instead of the courts. Addressing application of the third *Hart* factor, the Court noted that

45

it had rejected such comparisons in *Rummel* when it found that, absent a constitutionally imposed uniformity contrary to traditional notions of federalism, some State would always bear the distinction of treating particular offenders more severely than any other State. Finally, the Court found that it had rejected the application of the fourth *Hart* factor in *Rummel* because other crimes implicated other societal interests, making such a comparison inherently speculative. *Id*. at 373. After specifically disavowing the application of each of the *Hart* factors, the Supreme Court stated, "*Rummel* stands for the proposition that federal courts should be '[reluctant] to review legislatively mandated terms of imprisonment,' and that 'successful challenges to the proportionality of particular sentences' should be 'exceedingly rare.'" The Court also stated, "By affirming the District Court decision after our decision in *Rummel*, the Court of Appeals sanctioned an intrusion into the basic linedrawing process that is 'properly within the province of legislatures, not courts.'" In reversing the Fourth Circuit Court of Appeals, the Supreme Court concluded with a stern warning that lower federal courts were required to follow its precedent no matter how misguided the judges of those courts thought it to be. *Id*. at 374.

In *Solem v. Helm*, 463 U.S. 277 (U.S. 1983), the facts reflected that in 1964, 1966 and 1969, the defendant had been convicted of third-degree burglary. In 1972, he was convicted of obtaining money under false pretenses. In 1973, the

defendant was convicted of grand larceny. And, in 1975, he was convicted of third-offense driving while intoxicated. Thus, by 1975, the State of South Dakota had convicted the defendant of six nonviolent felonies. Then, in 1979, the defendant was charged with uttering a "no account" check for $100. The defendant pled guilty and was sentenced to a term of life imprisonment under the South Dakota repeat offender statute. Under South Dakota's laws, a person sentenced to life imprisonment was not eligible for parole. *Id*. at 279-282.

The defendant subsequently filed for a writ of habeas corpus arguing that his sentence constituted cruel and unusual punishment under the Eighth Amendment and his case reached the United States Supreme Court on certiorari. *Solem v. Helm*, 463 U.S. 277 at 283-284. Addressing the defendant's claim, the Supreme Court held that, as a matter of principle, a criminal sentence must be proportionate to the crime for which the defendant had been convicted. The Court recognized that reviewing courts should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals. The Supreme Court also specifically indicated that it was not adopting or implying approval of a general rule of appellate review of sentences. The Court stated, "Absent specific authority, it is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness

47

of a particular sentence; rather, in applying the Eighth Amendment the appellate court decides only whether the sentence under review is within constitutional limits." The Court added, "In view of the substantial deference that must be accorded legislatures and sentencing courts, a reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate." *Id*. at 291.

However, the Supreme Court then stated, "When sentences are reviewed under the Eighth Amendment, courts should be guided by objective factors that our cases have recognized." Then, the Court instructed that courts should look to the gravity of the offense and the harshness of the penalty. Addressing that factor, the Court specifically found that nonviolent crimes were less serious than crimes marked by violence or the threat of violence. As a second factor, the Court indicated that it might be helpful to compare the sentences imposed on other criminals in the same jurisdiction. The Court noted that it would be some indication that the punishment at issue might be excessive if more serious crimes were subject to the same or lesser penalties. Finally, the Court indicated that courts might find it useful to compare the sentences imposed for commission of the same crime in other jurisdictions. The Court summarized its holding by stating, "In sum, a court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the

48

harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." *Solem v. Helm*, 463 U.S. 277 at 291-292.

Applying the factors it had set out, the Supreme Court referred to the defendant's crime as "one of the most passive felonies a person could commit." The Court also found that the defendant's prior offenses, although classified as felonies, were all relatively minor, all were nonviolent, and none was a crime against a person. *Solem v. Helm*, 463 U.S. 277 at 296. After reviewing all of the factors, the Supreme Court concluded that the defendant's sentence was significantly disproportionate to his crime, and was therefore prohibited by the Eighth Amendment. *Id*. at 303.

It is notable that the three factors endorsed in by the Supreme Court in *Solem* are the first, third and fourth factors of *Hart* test that the Court had so vehemently disavowed in *Hutto v. Davis* as being contrary to the precedent established in *Rummel*. Indeed, the Supreme Court chastised the Fourth Circuit's application of those factors after its decision in *Rummel* by stating that the Fourth Circuit could be viewed as having ignored, consciously or unconsciously, the hierarchy of the federal court system created by the constitution and Congress. Then, less than a year later, the Court seems to have done the same thing that led to the Fourth Circuit's reprimand. However, despite the obvious inconsistency in its opinions,

the Court did not overrule *Hutto v. Davis* and specifically refused to overrule *Rummel*. *Solem v. Helm*, 463 U.S. 277 at 303.

In *Harmelin v. Michigan*, 501 U.S. 957 (U.S. 1991), the defendant was convicted of possessing 672 grams of cocaine and sentenced to a mandatory term of life in prison without possibility of parole. The defendant appealed, claiming that his sentence constituted cruel and unusual punishment in violation of the Eighth Amendment. His case eventually reached the United States Supreme Court on certiorari. *Id*. at 961.

Addressing the defendant's claim, the United States Supreme Court issued numerous opinions. In an opinion joined by the Chief Justice, Justice Scalia found that the defendant's sentence could not be considered unconstitutionally disproportional because the Eighth Amendment contained no proportionality guarantee. Justice Scalia also determined that *Solem* was wrongly decided and completely rejected its analysis. *Harmelin v. Michigan*, 501 U.S. 957 at 962-994. Justice Kennedy was joined by Justices O'Connor and Souter in his opinion. Contrary to Justice Scalia's opinion, Justice Kennedy found that the Eighth Amendment does forbid sentences that are "grossly disproportionate." *Id*. at 997. However, he specifically wrote, "The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Id*. at 1001. Justice

Kennedy specifically held that the second and third factors from *Solem*, the sentences imposed on other criminals in the same jurisdiction and the sentences imposed for commission of the same crime in other jurisdictions, should only be considered in the rare case when a threshold comparison of the crime committed and the sentence imposed led to an inference that the sentence was grossly disproportionate. He then weighed the defendant's crime of possession of over 650 grams of cocaine against his punishment of life in prison without parole and concluded that the defendant's sentence was not grossly disproportionate to the underlying crime. Consequently, Justice Kennedy found it unnecessary to proceed to the additional steps of the *Solem* analysis. *Id*. at 1005. Finally, the four remaining justices in *Harmelin* dissented and issued three separate opinions. However, all of the dissenting justices did agree with Justice White, who argued for the continued application of the full three-pronged *Solem* test. *Id*. at 1008-1009.

In *Ewing v. California*, 538 U.S. 11 (2003), one of the more recent Supreme Court cases addressing proportionality in non-capital sentencing, the Court held the California three strikes law was constitutional and concluded that a sentence of twenty-five years to life for felony grand theft did not violate the Eighth Amendment. In deciding the case, the Supreme Court employed the threshold analysis provided by Justice Kennedy in *Harmelin* to decide that the sentence was not grossly disproportionate to the crime. *Id*. at 23-24. The Court considered the

specific circumstances of the case, including the defendant's criminal history, the discretion allotted to the sentencing judge and the prosecutor in deciding how to charge the defendant under the statute, and the state's interest in protecting its citizens from repeat offenders. Based on those factors, the Court decided in its initial inquiry that the sentence imposed was not grossly disproportionate to the offense committed. And, because the Court did not find the sentence was grossly disproportionate after its initial inquiry, the Court found it unnecessary to conduct the inter-and intra-jurisdictional analyses from *Solem*. *Id.* at 25-31.

### *Fifth Circuit Precedent*

In *McGruder v. Puckett*, 954 F.2d 313 (5th Cir. 1992), the defendant, in 1954, was found guilty of two counts of armed robbery and sentenced to serve two to nine years. In 1957, he was found guilty of burglary and larceny and sentenced to serve from one to ten years, running concurrently with his earlier sentence. The defendant was also sentenced in 1957, to another concurrent term of four to eight years for escape from a penitentiary. In 1964, he was found guilty of armed robbery and given three to ten years. Finally, in 1983, the defendant was convicted by a jury in Harrison County, Mississippi, for the burglary of an automobile, specifically for stealing twenty cases of beer from a delivery truck. The defendant had been indicted as a habitual offender under the Mississippi Code. After a

52

sentencing hearing where the defendant's record of prior felony convictions was established, he was sentenced, as a habitual offender, to life in prison without parole. *Id*. at 314.

On appeal, the defendant alleged that his sentence was unconstitutionally disproportionate. *McGruder v. Puckett*, 954 F.2d 313 at 315. Addressing that argument, the Fifth Circuit noted the framework of objective factors adopted by the Supreme Court in *Solem*. However, the Court also noted that *Solem* must be viewed in the light of the Supreme Court's decision in *Harmelin v. Michigan*. By applying a head-count analysis, the Fifth Circuit found that seven members of the Supreme Court supported a continued Eighth Amendment guaranty against disproportional sentences. However, the Court recognized that only four justices supported the continued application of all three factors in *Solem* while five justices rejected the continued application of all five factors. The Court then stated, "Thus, this much is clear: disproportionality survives; *Solem* does not." Relying upon Justice Kennedy's opinion for guidance, the Court stated that it would initially make a threshold comparison of the gravity of the defendant's offenses against the severity of his sentence. Then, only if the Court inferred that the defendant's sentence was grossly disproportionate to the offense would it then consider the remaining factors of the *Solem* test and compare the sentence received to (1)

53

sentences for similar crimes in the same jurisdiction and (2) sentences for the same crime in other jurisdictions. *Id.* at 316.

In making the threshold comparison of the gravity of the defendant's offenses against the severity of his sentence, the Court noted that the defendant had been sentenced as a habitual offender. The Court recognized that, because he was sentenced as a habitual offender, the defendant's sentence was imposed to reflect the seriousness not only of his most recent offense but also the seriousness of his prior offenses. *McGruder v. Puckett*, 954 F.2d 313 at 316. In comparing the gravity of the defendant's offenses in relation to the harshness of his sentence, the Fifth Circuit then referred to the Supreme Court's decision in *Rummel* as a "handy guide" to assist in the determination. After comparing the offenses and criminal records of the defendants in each case, the Court found that, in the light of *Rummel*, there could be no argument that the defendant's sentence was not disproportionate, much less *grossly* disproportionate, to his offense. Because the Court did not find that the defendant's sentence was grossly disproportionate to the offense, it did not consider the remaining factors of the *Solem* test. *Id.* at 317.

### *Texas Precedent*

Texas appellate court have followed and applied the Fifth Circuit's *McGruder* analysis in addressing Eighth Amendment proportionality complaints. Under that analysis, Texas courts have initially made a threshold comparison of the

gravity of the offense against the severity of the sentence. If a court has determined during that threshold comparison that the sentence is not grossly disproportionate to the offense, they have uniformly refused to consider the remaining *Solem* factors. *See Jacobs v. State*, 80 S.W.3d 631 (Tex.App.—Tyler 2002; *no pet.*).[10]

In addition, in *Whitehead v. State*, 11-05-00179-CR, 2006 WL 3685230, at *1 (Tex. App.—Eastland Dec. 14, 2006), *review dismissed,* PD-234-07, 2008 WL 1930673 (Tex. Crim. App. Apr. 30, 2008), one Texas appellate court addressed the appeal of a habitual offender who was sentenced to life in prison for failure to appear. In that case, a jury found the defendant guilty of the offense of bail jumping and failure to appear. Also finding that the defendant had been finally convicted of two prior felony offenses as alleged in the indictment, the jury assessed his punishment at life imprisonment. On appeal, the defendant argued that his life sentence violated the Eighth Amendment of the United States Constitution. Addressing that argument, the Eastland Court found that a life sentence imposed under Texas habitual offender statutes does not constitute cruel

---

[10] *See also Moore v. State*, 54 S.W.3d 529, 542 (Tex.App.—Fort Worth 2001, *pet. ref'd*); *Bradfield v. State*, 42 S.W.3d 350, 353 (Tex.App.—Eastland 2001, *pet. ref'd*); *Hicks v. State*, 15 S.W.3d 626, 632 (Tex.App.—Houston [14th Dist.] 2000, *pet. ref'd*); *Dunn v. State*, 997 S.W.2d 885, 891-92 (Tex. App.—Waco 1999, *pet. ref'd*); *Jackson v. State*, 989 S.W.2d 842, 845 (Tex. App.—Texarkana 1999, *no pet.*); *Mathews v. State*, 918 S.W.2d 666, 669 (Tex.App.—Beaumont 1996, *pet. ref'd*); *Puga v. State*, 916 S.W.2d 547, 549-50 (Tex.App.—San Antonio 1996, *no pet.*); *Lackey v. State*, 881 S.W.2d 418, 421 (Tex.App.—Dallas 1994, *pet. ref'd*).

and unusual punishment in violation of the Eighth Amendment. The Court noted that the defendant was relying primarily on the case of *Solem v. Helm*. However, the Court found that *Solem* was distinguishable because the defendant in *Solem* was sentenced to life with no possibility of parole, whereas the defendant was eligible for parole. The Court then held that the defendant's life sentence for failure to appear did not violate the *Eighth Amendment. See id*.

Another court of appeals has specifically found that *Solem* is no longer controlling law. *See Trevino v. State*, 07-04-0066-CR, 2005 WL 1404037, at *5 (Tex. App.—Amarillo June 15, 2005, pet. ref'd) (not designated for publication). Instead of applying the three *Solem* factors, the court has used the Fifth Circuit's *McGruder* analysis and, after determining that a sentence is not grossly disproportionate to the offense, has refused to consider the remaining *Solem* factors.

As set out above, using *Rummel* as a "handy guide" as suggested by the Fifth Circuit in *McGruder*, it is evident that, contrary to Appellant's assertions, his sentence is not unconstitutionally disproportionate. Appellant's status as a habitual offender (I Supp. C.R. at 4) means that his sentence is imposed to reflect the seriousness not only of his most recent offense, but also the seriousness of his prior offenses. In light of the catastrophic harm and loss of life Appellant could have caused multiple times – to himself and to others – it cannot be said that the

defendant's sentence was disproportionate, much less *grossly* disproportionate, to his offense. Therefore, evaluation under the second and third *Solem* factors is unnecessary and Appellant's point of error should be denied, particularly in light of recent similar cases recognizing such sentences do not constitute cruel and unusual punishment. *See Davidson*, 2014 WL 3809813, at *1.

## Prayer

Wherefore, premises considered, Appellee respectfully prays that this Honorable Court of Appeals affirm in all matters the judgment of the trial court in this case. Alternatively, if the Court does not affirm the judgment of the trial court, Appellee prays that the Court find the trial court erred in suppressing the evidence from the warrantless blood draw based on *Villareal*. Appellee also prays for all other relief, both special and general, in law and in equity, to which it may be entitled.

JENNIFER THARP
Criminal District Attorney

By

/s/ Joshua D. Presley
**Joshua D. Presley**
SBN: 24088254
Assistant District Attorney
150 N. Seguin Avenue, Ste. #307
New Braunfels, Texas 78130
Phone: (830) 221-1300
Fax: (830) 608-2008
E-mail: preslj@co.comal.tx.us
Attorney for the State

## Certificate of Service

I, Joshua D. Presley, Assistant District Attorney for the State of Texas, Appellee, hereby certify that a true and correct copy of this Brief for the State has been delivered to Appellant DAVID KENT THACKER, JR.'s attorney of record in this matter:

Gerald C. Moton
motongerald32@gmail.com
11765 West Avenue, PMB 248
Austin, TX  78216
*Attorney for Appellant on Appeal*

By electronically sending it through efile.txcourts.gov to the above-listed email address, this the 8th day of September, 2015.

/s/ Joshua D. Presley
**Joshua D. Presley**

## Certificate of Compliance

I hereby certify, pursuant to Rule 9.4(i)(2)(B) and Rule 9.4(i)(3) of the Texas Rules of Appellate Procedure that the instant brief is computer-generated using Microsoft Word and said computer program has identified that there are 13,308 words or less within the portions of this brief required to be counted by Rule 9.4(i)(1) & (2) of the Texas Rules of Appellate Procedure.

The document was prepared in proportionally-spaced typeface using Times New Roman 14 for text and Times New Roman 12 for footnotes.

/s/ Joshua D. Presley
**Joshua D. Presley**

# Appendix

NO. CR2013-096

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| vs. | § | COMAL COUNTY, TEXAS |
| | § | |
| DAVID KENT THACKER, JR. | § | |

## DEFENDANT'S MOTION TO RECONSIDER ORDER DENYING MOTION TO SUPPRESS BLOOD DRAW

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES DAVID KENT THACKER, JR. , the Defendant in the above cause, and files this motion to reconsider it denial of Defendant's Motion to Suppress Blood Draw in view of *Antonio Aviles v. The State of Texas*, No. 04-11-00877-CR decided August 6, 2014.

1. In the original submission of *Antonio Aviles v. The State of Texas*, No. 04-11-00877-CR the Fourth Court of Appeals held the trial court did not err in denying appellant Antonio Aviles's motion to suppress the blood specimen drawn pursuant to section 724.012(b)(3)(B) of the Texas Transportation Code. *Aviles v. State*, 385 S.W.3d 110, 116 (Tex. App.—San Antonio 2012), *vacated*, 134 S.Ct. 902 (2014). Relying upon *Beeman v. State*, 86 S.W.3d 613, 616 (Tex. Crim. App. 2002), we held section 724.012(b)(3)(B) permits a police officer to take a blood specimen from DWI suspect without a warrant if the officer has credible information that the suspect has been previously convicted on at least two prior occasions of DWI. *Id.*

Aviles sought review in the Texas Court of Criminal Appeals, but that court refused his petition. Thereafter, Aviles filed a petition for writ of certiorari in the United States Supreme Court. The Supreme Court granted the petition, vacated our judgment, and remanded the matter to us for further consideration in light of the Court's opinion in *Missouri v. McNeely*, 133 S.Ct. 1552 (2013). *Aviles v. Texas*, 134 S.Ct. 902, 902 (2014). After reviewing the denial of the motion to suppress in light of *McNeely*, in a published opinion the Fourth Court of Appeals reverse the trial court's judgment and remanded the matter to the trial court for a new trial.

CERTIFIED TO BE A TRUE AND CORRECT COPY

HEATHER N. KELLAR
COMAL COUNTY
DISTRICT CLERK
PAGE___1___OF___3___

2. A copy of the published opinion in Antonio **AVILES**, v. The **STATE** of Texas, No. 04-11-00877-CR decided August 6, 2014 is affixed hereto and made apart hereof.

**WHEREFORE, PREMISES CONSIDERED,** Defendant respectfully prays that this Honorable Court will grant this motion to reconsider it denial of Defendant's Motion to Suppress in all things, or in the alternative, that this Court will set this matter down for a hearing prior to trial on the merits and that at such hearing this Motion will be in all things granted.

Respectfully submitted,
Gerald C. Moton
11765 West Avenue, PMB 248
San Antonio, TX 78216
Tel: (210) 410-8153
Fax: (210) 568-4389
TXBN 14596350

By:_____
Gerald C. Moton
State Bar No. 14596350
ATTORNEY FOR Defendant

CERTIFIED TO BE A TRUE AND
CORRECT COPY

HEATHER N. KELLAR
COMAL COUNTY
DISTRICT CLERK
PAGE____ OF 3

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing document was

was    delivered to the District Attorney's Office, at the Comal County Courthouse Annex, 150 Seguin.

New Braunfels, Texas 78130, on Thursday, August 14, 2014 by hand delivery.

BY: _____

GERALD C. MOTON
STATE BAR NO.:14596350

## ORDER

On _Janu 23_ , 2014, came on to be heard Defendant's  motion to reconsider it denial of

Defendant's Motion to Suppress, and after hearing same, the Court orders that the Motion to Suppress

Blood Draw is hereby granted for the reasons set forth in as indicated in _Antonio Aviles v. The State of_

P.D. 0306-14

_Texas_, No. 04-11-00877-CR  decided August 6. 2014.

V . DAVID

V.llAnneal                   November 26, 2014

_____
Judge Presiding

CERTIFIED TO BE A TRUE AND
CORRECT COPY

HEATHER N. KELLAR
COMAL COUNTY
DISTRICT CLERK
PAGE 2 OF 2

STATE OF TEXAS
COUNTY OF COMAL
I certify this to be a true and correct
copy of the record FILED & RECORDED
in the Official Court records of District
Court on this date and time stamped
thereon.

Heather N. Kellar
Comal County District Clerk
By: